WILLIAM J. HIGGINS, APPELLEE, V. GARFIELD COUNTY,
APPELLANT.

FILED JANUARY 13, 1922. No. 21842.

1. Counties: LIABILITY. Section 4, ch. 7, Laws 1889, renders
counties liable to individuals sustaining damages to their per-
sons or property by reason of insufficiency or want of repairs
of any highway or bridge which a county is obligated to keep
in repair.

2. ———: ———: CONTRIBUTORY NEGLIGENCE. Evidence examined,
and held that the plaintiff in attempting to cross a county bridge,
part of a public highway in Garfield county, was not chargeable
with such contributory negligence as would preclude a recovery
for damages occasioned to an automobile truck by the collapse
of the bridge.

3. ———: ———: EVIDENCE. Evidence examined, and held suffi-
cient to sustain a judgment of the trial court assessing the
plaintiff's damages in the sum of $275.

4. ———: ———: NOTICE. No actual notice to the county of the
defective condition of the bridge was necessary. Raasch v. Dodge
County, 43 Neb. 508; Bethel v. Pawnee County, 95 Neb. 203.

5. ———: ———. The liability of the county arises, not alone from
the constructing, but as well from the maintaining of a bridge.
Its existence is a continuing invitation, not only as to a mode of
travel prevalent and usual in its inception, but also as to any
mode of travel which may be devised and develop into common
use during its existence. Therefore, held that although automo-
bile traffic trucks were not in use in the county when the bridge
was originally built, but that some had been in operation a year
before the accident, and that six or seven were used by farmers
in the vicinity of the bridge at the time of the accident, the
county was nevertheless liable for damages to such traffic truck.

APPEAL from the district court for Garfield county:
BAYARD H. PAINE, JUDGE. Affirmed.

E. M. White, for appellant.

Allen & Hronek and Guy Laverty, contra.

Heard before MORRISSEY, C. J., ROSE and ALDRICH, JJ.,
FITZGERALD and WAKELEY, District Judges.

WAKELEY, District Judge.

On November 5, 1919, Higgins filed against Garfield county a claim for $445 for damages to a traffic truck because of its falling through a bridge spanning Cedar river in said county. On December 3 he filed a supplemental claim in the sum of $290; $65 thereof being for additional repairs necessitated since the filing of his original claim, and $225 thereof for being deprived of the use of the truck. His total claim was $735. This was rejected by the county commissioners, and Higgins appealed to the district court. A jury was waived and the action tried by the Honorable Bayard H. Paine, who rendered a judgment for the plaintiff for $275. From this the county has appealed, urging that the judgment is not sustained by the evidence.

Appellee, Higgins, owned a cattle ranch in the northern part of Garfield county on which he fed cattle. He had purchased for $2,250 a new traffic truck used in the carrying of supplies to and from his ranch. The evidence discloses that Garfield county is sparsely settled; that there are few roads and bridges in it; that the bridge in question crosses Cedar river, making that locality accessible to a number of ranchers in the vicinity, and to a large gravel pit about one-half mile beyond the river.

It is stipulated that the bridge was built more than twelve years ago, and is part of a public highway, and had been repaired several times. One of the witnesses, Douhit, says the bridge, a wooden one, was in poor condition, and that the commissioners never inspected it; that it had been cobbled up and fixed so many times that it was hard to tell which end was south. On October 8, 1919, Herman Heldt, foreman of the Higgins ranch, crossed to the gravel pit with the truck, loaded thereon about two tons of gravel, a customary load, and attempted to recross the bridge in question. As he drove upon the bridge, he noticed, he says, "one plank bent in a little, broke like, gave in just a little, splintered, prob-

ably six inches, about the center of the south section; outside of that, the bridge looked as good as it ever did. Probably six inches was defective." His gravel weighed two tons; the gravel and truck weighed about 4,400 pounds, an average load. The bridge consisted of two spans, each 20 feet long and 14 wide; one 7-foot and one 10-foot approach. The top was of good planking, laid upon 2 by 12 stringers, 10 to each span, and about 16 inches apart. It was supported by three piers, one at each end, and one in the center to support the ends of the spans. The stringers composing the same rested upon these piers, overlapping the piers from two to four inches. These stringers were not bolted or strapped to the piers. They were held in place by rather small nails. They were toe-nailed in, as the witnesses say, with three or four small nails. The stringers were not bolted to each other. There were no iron shoes or straps to hold them to the piers. No other braces were used to support the bridge. McMullen, the road overseer, had occasion to replace a cap on the pier under the bridge where an old cap had rotted away. This was about six years before the accident. His recollection was that, at that time, the stringers lapped six inches over the cap. No sign was placed on the bridge to indicate its carrying capacity.

As stated, Heldt endeavored to cross the bridge with his truck. As he neared the center, he swerved out just far enough to miss the defect in the planking. When he got about half way across, he says he felt the hind end of the truck going down and jumped. This is all he knew until he saw the truck in the bottom of the river. The front part of the truck had caught upon and was held by the center pier of the bridge; the back end had dropped down into the river. The gravel, running down, broke out the end-gate and broke the plank down through the center. Examination disclosed the toe-nails with which the stringer had been fastened to the piers had loosened and come out; that, as they did

so, the stringers had slipped off, or fallen away from the center pier; that thereupon the entire south span of the bridge had collapsed and fallen into the river. When the span fell, all but two or three stringers at the north side gave way and fell with it. Plaintiff claims that the fall bent the rear axles of the truck, jammed the differential, disaligned the machinery, broke the end-gate, permitted the gravel to slip out, twisted and weakened the box, bent and weakened the cross-bar, and otherwise damaged the truck.

As stated, the court found in favor of the plaintiff and assessed his damages at $275. The county contends that the court erred for reasons which may be summarized as follows: That any damage occasioned was the result of the plaintiff's own negligence in attempting to cross the bridge, after he had ascertained it was in a defective or dangerous condition; that plaintiff used the truck after the accident without having it repaired or inspected by a competent mechanic; that the damage was caused by the unskilful and negligent manner in which the machine was operated, and the lack of timely repairs; that the actual damage was nominal; that the county officials had no notice, actual or constructive, that the bridge was not in a safe condition for any reasonable or ordinary use; that when the bridge was built no automobile trucks were in use in the vicinity and but few at the time of the trial in September, 1920; and, lastly, that, while the bridge is a part of a legally established county road, it is in fact used by very few people.

The present action is brought under the provisions of section 4, ch. 7, Laws 1889, which for the first time in the history of our jurisprudence made counties liable to individuals sustaining damages from defective roads or bridges.

Was the plaintiff guilty of such contributory negligence as precludes his recovery? When Heldt crossed the bridge, going over to the gravel pit, he noticed there was a plank cracked; as he expressed it, "broke like, or

splintered." He may have splintered it himself in crossing the bridge a day or two before. With this exception, he says the bridge looked perfectly safe to him, as good as it ever did or he would not have crossed it; that he had seen other people crossing the bridge with loads as large as his. The evidence shows that others, some with heavier trucks, had used the bridge. Concede that he had cracked the plank a day or two before, and that, as McMullen says, "Heldt told him he turned his truck a little to one side and 'straddled' the defective plank in order to avoid it." Would this crack in a single place in the floor warn one that it would be dangerous to cross the bridge with a truck? Did it point Heldt to any structural or fatal defect in the bridge itself? Did it warn him that, if he attempted to cross, it would collapse and plunge his truck into the river? We think such a deduction would be unwarranted, would be too harsh. There is not the slightest suggestion in the evidence, or in the briefs of counsel, that the defect in the plank had anything whatever to do with the collapse of the bridge. Whether a certain condition surrounding an object charges a man with negligence must to a great extent depend upon the use such person intends to make of such object. It might be negligence if a man, knowing the defect was there, drove a horse over the bridge, and the horse got his foot through the plank. Such a result would be the very thing that might have been anticipated. But that is not this case. Had the bridge been barricaded, and Heldt had nevertheless removed the barricade and attempted the crossing, and had sustained damage because of some structural defect or weakness in the bridge, we think he would be chargeable with negligence. So, again, if there had been on the bridge a sign, limiting its carrying capacity, for example, to 3,000 pounds, and Heldt had disregarded this, we think he would have been chargeable with negligence. Conditions such as these would have been fraught with a monitorial significance which no traveler could evade; would have

proclaimed danger of some sort in the crossing of the bridge; a defective plank did not.

Counsel for appellant in his brief calls our attention to *Clingan v. Dixon County*, 82 Neb. 808, *Johnson County v. Carmen*, 71 Neb. 682, and other cases in this court, holding that contributory negligence on the part of the plaintiff will defeat his action, even if the county be negligent. We agree to this. But, as stated, we do not think that the attempt to cross the bridge with the truck convicts the plaintiff of negligence. Concede, however, that Heldt, the driver, was negligent to some extent, in some degree. The cases above cited were decided prior to the passage of our comparative negligence act in 1913. Under this, the plaintiff's contributory negligence does not bar his recovery, when, weighing the negligence of the two parties, that of the plaintiff is slight as compared with that of the defendant. The case was tried to the court, who rendered judgment without specific findings. We assume, however, that if the court found Heldt chargeable with any negligence his recovery was reduced in proportion thereto, as prescribed by the statute. We feel fortified in this conclusion when we consider that the plaintiff sued for $735 and recovered $275.

It is true, as claimed by the defendant, that the truck was used by plaintiff after the accident, and before part of the repairs were made. The testimony is that some of the repairs necessitated delay, and were not made until six months after the accident; but it does appear that some repairs, a new differential, face wheel, spider wheel, new tires, and labor incident thereof, were made and furnished soon after the accident, and that these repairs themselves amount to as much as the judgment recovered.

It is claimed that the damages inflicted were nominal. New gears and tires, and new differential, and new endgate were necessitated; the left hind axle bent, the wheel "dished" or bent out, and the iron frame work of the machine bent or pulled in four inches. A. W. Tunnicliff, an automobile mechanic, called by the defense, examined

the machine and testified that, in his opinion, repairs necessitated could be made for $75 to $100. Schuyler, another mechanic, called by the defense, estimated them at between $50 and $75. There was a wide discrepancy between the witnesses for the respective parties, and it is evident the court rendered a judgment for what he thought was the actual damage sustained as reflected by the evidence. As this finding is supported by ample evidence, we do not think we should disturb it.

As to notice; no actual notice to the county was necessary. In *Raasch v. Dodge County,* 43 Neb. 508, the court said: "For an injury caused by an unsafe condition of a county bridge, a county is liable in damages, notwithstanding the fact that no notice of such condition had, previous to the occurrence of the accident, been given to any officer of the county concerned. * * * The provisions of section 4 of the act referred to expressly confers a right of action independently of whether or not the county authorities had been previously notified of the unsafe condition of the bridge which caused the accident." And in *Bethel v. Pawnee County,* 95 Neb. 203, the court approved as concise and accurate this instruction: "For an injury caused by an unsafe and defective condition of a county bridge, a county is liable for damages, notwithstanding the fact that no actual notice of such condition had, previous to the occurrence of the accident, been given to any officer of the county concerned, where the defects are of such a nature, or have existed for such a length of time that, by the exercise of ordinary diligence, they might have been discovered and repaired." See, also, *Hollingsworth v. Saunders County,* 36 Neb. 144. Tested by this rule, we think the county had ample notice of the defects in the bridge. The evidence discloses that the bridge had been built 12 years; "that it had undergone frequent repairs." Douhit said it had been "cobbled" so often it was difficult to say in what direction it stood; it was never in very good condition and never inspected by the commissioners. In

May, 1919, John Bushbaum, a farmer, driving a truck somewhat heavier than the plaintiff's, and intending to cross with a load of gravel, examined the board bottom and the stringers under the bridge and found their condition such that he concluded he could not safely cross and abandoned the attempt. We think these facts sufficient to impute knowledge to the county.

It is argued that when the bridge was built no automobile trucks were in use in the county, and even at the time of the trial but few were operated in the county; and it is argued, inferentially at least, that it would be unjust to hold the county liable under these circumstances. It is probably true that when the bridge was built, 13 years ago, these trucks were not in use in that locality. As to their use since then, it appears that some trucks were in use perhaps a year before the acci·dent, and that at the time thereof, in April, 1919, some six or seven, according to Bushbaum, were owned and operated by farmers living in the vicinity of the bridge.

The liability of the county springs, not alone from the *constructing,* but also from the *maintaining* of the bridge. Its existence is, unless restricted in some way, a continuing invitation, not only as to a mode of travel prevalent and usual in its inception, but also·as to any mode of travel which may be devised and develop into common use during its existence. It is said in *Seyfer v. Otoe County,* 66 Neb. 566: "In constructing and maintaining a bridge for public use, a municipality is not limited in its duty by the ordinary business use of the structure, but is required to provide for what may be fairly anticipated for the proper accomodation of the public at large in the various occupations which, *from time to time, may be pursued in the locality where it is situated."*

So, also, in *Miles v. Richardson County,* 100 Neb. 294, decided 14 years later, the court said: "That the bridge was reasonably safe for travel with a team and wagon did not relieve the county of its duty to make it reasonably safe for the passage of cattle. . *   *   * The re-

quirements of a bridge are that it shall be reasonably safe for such use as the public may make of it." And in this case, and also in *Kovarik v. Saline County,* 86 Neb. 440, the doctrine laid down in *Seyfer v. Otoe County, supra,* is reaffirmed in the identical words therein used.

For the reasons given, we think the judgment should be, and it is

AFFIRMED.